(C.D. 2695)

CHESTER TRICOT MILLS, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided May 31, 1966)

*Sharretts, Paley & Carter* (*Eugene F. Blauvelt* and *Gail T. Cumins* of counsel) for the plaintiff.

*John W. Douglas,* Assistant Attorney General (*Sheila N. Ziff* and *Arthur H. Steinberg,* trial attorneys), for the defendant.

Before RAO and FORD, Judges

FORD, Judge: This case is directed against the action of the collector of customs in classifying certain nylon as filaments of synthetic textile, single, weighing less than 150 deniers per length of 450 meters, under the provisions of paragraph 1301 of the Tariff Act of 1930. By virtue of this classification duty was assessed thereunder at the rate of 50 per centum ad valorem.

It is the position of plaintiff herein that said merchandise is in fact yarn and as such properly subject to classification under said paragraph 1301, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and, accordingly, dutiable at the rate of 22½ per centum ad valorem, but not less than 25 cents per pound. By

virtue of a stipulation entered into by and between counsel for the respective parties that said merchandise is valued at over $1.11⅑ per pound, the rate of 22½ per centum ad valorem is not less than 25 cents per pound.

The pertinent portions of the statute involved herein are as follows: Paragraph 1301 of the Tariff Act of 1930:

Filaments of rayon or other synthetic textile, single * * * all the foregoing not specially provided for, * * * weighing less than one hundred and fifty deniers per length of four hundred and fifty meters, 50 per centum ad valorem; * * *: *Provided*, That none of the foregoing filaments shall be subject to a less duty than 40 cents per pound, * * *.

Paragraph 1301 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, *supra:*

Yarns of rayon or other synthetic textile, not specially
 provided for, singles, weighing less than 150 deniers
 per length of 450 meters, and not having more than
 20 turns twist per inch_____. 22½% ad val.,
 but not less
 than 25¢ per lb.

The official papers together with the invoice and entry papers are in evidence. A number of plaintiff's exhibits, including an illustrative exhibit, and the testimony of two witnesses called by plaintiff comprise the remainder of the record.

Plaintiff's exhibits consist of: a spool containing merchandise representative of the nylon material covered by this protest; a sample of the imported merchandise at an earlier stage in its production, that is, prior to its having undergone stretching and twisting; a photograph showing the merchandise at its earlier unstretched stage as it is being taken up on bobbins at the plant of the manufacturer; a diagram of a device known as a drawtwister; a skein of 15 denier nylon material processed by the drawtwister; portions of the February, March, and September 1961 issues of the magazine "Modern Textiles." In addition, there is plaintiff's illustrative exhibit, a diagram prepared by the manufacturer, showing the successive steps in the production of the imported merchandise.

Plaintiff's first witness was Dr. Hugo Schilke of Milan, Italy. Dr. Schilke is central technical director of Chatillon, the Italian manufacturer of the merchandise covered by this protest, and is in charge of Chatillon's production of synthetic fibers. At Chatillon, Dr. Schilke supervised the installation of the machinery and system used in manufacturing the merchandise with which this protest is concerned

and was instrumental in the development of the processing by which nylon material is produced by Chatillon and thereafter to that firm's entry into the nylon market.

The merchandise covered by this protest consists of single strand nylon weighing 15 deniers per length of 450 meters, valued at over $1.11½ per pound. Dr. Schilke, with the aid of a number of the aforementioned exhibits, described the steps employed in Chatillon's production of this 15 denier nylon. The raw material for the process is polymer nylon in the form of chips. The chips, contained in a tank, are transferred to a melting pot which converts them to a viscose melt subsequently spun through a spinneret with the aid of a system of pumps. The melt is extruded through the hole or holes in the spinneret, causing the formation of individual nylon strands. The exact number of strands thereby produced depends upon the quantity of holes in the spinneret. Resolidification of the melt, now in filament form, is effected by exposing the nylon to cool air. A single strand of the solidified material is then wound on a bobbin.

The bobbin containing the nylon strand is then transferred to a drawtwister, a device which stretches the material from approximately three and one-half to four times its original length. A thread guide and a feed roll lead the material from the bobbin to a stretching zone where the strand is drawn. At the end of the stretching process, the filament is passed over a running wheel, the godet, that imparts its speed to the strand. In addition to its stretching function, the drawtwister imparts a twist to the drawn nylon. The twist is the result of the speed differential between the bobbin containing the undrawn nylon and the spindle on which the drawn filament is finally collected. The spindle holds a pirn on which the filament is ultimately wound. The drawtwister contains a ring traveler which operates between the end of the drawing zone and the collecting spindle. This device causes the material traveling vertically from the godet to be swirled in a circle, the orientation of which is a horizontal plane. The result is that the strand reverses itself 90 degrees from its vertical position. At this point, the material is wound onto the pirn held by the spindle. This method of collecting the drawn material also adds to the twist.

The material wound onto the pirn is 15 denier nylon. The unstretched nylon wound on the bobbin was approximately 51 denier. The stretching results in orientation of the molecules in the direction of the filament axis. The merchandise covered by this protest received a twist approximately eight turns per meter as a result of the process described. Eight turns per meter is the equivalent of approximately twenty-two one-hundredths turn per inch. The twist can be varied by adjusting the drawtwister, but it is not possible to eliminate the

twist entirely when using that particular device. Dr. Schilke claims that, while twenty-two one-hundredths turn per inch is regarded as negligible, difficulty may arise if the filament is used in a textile machine without any twist. Additional twist would entail greater expense to the manufacturer. A twist of twenty-two one-hundredths turn per inch can be detected by microscopic examination. There are drawing machines that produce untwisted strands, but they are not employed in the manufacture of the merchandise covered by this protest. The testimony does not disclose whether or not the manufacturer of the material involved under this protest employed such a device in any of its operations.

The manufacturer shipped the drawn and twisted filament on pirns. However, it is possible to collect the material on beams or in the form of skeins by first unwinding the pirns. Unwinding and use of these alternative methods creates no additional twist in the nylon merchandise.

Dr. Schilke's understanding of the term "textile yarn" is any filament, natural or synthetic, usable on textile machines such as knitting machines, looms, and hosiery machines. He testified that twist is one of the characteristics that yarns normally possess which distinguish them from filaments. He also indicated that, before the nylon material becomes a yarn, it must first be a filament. He referred to the unstretched and untwisted nylon strand as a filament and to the merchandise covered by this protest as a yarn. Dr. Schilke stated that it was not until after stretching that the nylon material had any end use. Prior to drawing, it could not be used to create a fabric. He stated that the twist, while negligible, was necessary to avoid trouble in the manufacture of textiles and that difficulty would be encountered if untwisted monofilament was substituted for the twisted material. Chatillon also puts oil on the drawn and twisted nylon to produce better runability in the textile machine.

Plaintiff's second witness was Mr. Melvin Buckley, superintendent of Chester Tricot Mills of Pennsylvania, plaintiff in this case. Mr. Buckley is also production manager of Pennwood Hosiery Mills of Pennsylvania. The witness received a bachelor of science degree in textile engineering from Philadelphia College of Textiles and Sciences in 1953. He has been involved in the textile industry since then. He identified the merchandise covered by this protest as 15 denier nylon yarn, monofilament, and said he was familiar with it prior to attending college during the duration of his college education, and also thereafter, having used it "all the time" at Chester Tricot Mills and at Pennwood. Plaintiff manufactures tricot fabric, utilizing a form of warp knitting. The process is begun by taking the stretched

and twisted nylon from the pirns and knitting it into an unfinished fabric that is then subjected to dye treatment and finishing by other processors. Plaintiff's product is eventually made into ladies' blouses and girls' slips. Penwood Hosiery produces four feed seamless hosiery from the twisted and drawn 15 denier nylon. Chester Tricot uses approximately 450,000 to 500,000 pounds of 15 denier nylon per year, while Pennwood consumes 70,000 to 75,000 pounds annually. The witness is in charge of all production, quality control, all shipments, in and out, and all personnel at Chester Tricot.

Mr. Buckley testified that the great majority of his friends in the textile trade subscribe to the magazine "Modern Textiles." To the best of his knowledge, it is a well read textile publication, but he is not familiar with its exact circulation. The merchandise covered by this protest was imported in April of 1961. Three issues of "Modern Textiles," corresponding to the months of February, March, and September 1961, were shown to contain lists of quotations of current prices of various types of yarn. The witness testified that these lists indicated that American Enka Corp., Chemstrand, and du Pont had available for sale, at the aforementioned publication dates, 15 denier monofilament nylon similar in all respects to the merchandise covered by this protest and that each of these lists was titled "Non Cellulosic Yarn Nylon."

Chester Tricot purchases material identical to that covered by this protest from domestic and foreign manufacturers. These various purchases are used for a single purpose, employ the same processes and the same machines. Since 1957, Chester Tricot has been purchasing this material from American Enka Corp., Allied Chemical, Firestone, and Seaquiot, to name a few of the domestic suppliers. In addition to Chatillon, Chester Tricot, since it has been under Mr. Buckley's management, has purchased 15 denier material, identical to the merchandise involved in this case from foreign producers including Rhotiatoce (Italian), Snia Viscosa Co. (Italian), and Fabelta (French). When Mr. Buckley first came to work for Chester Tricot, that firm purchased exclusively domestic products, those of du Pont and Chemstrand. Those products were identical to the merchandise covered by this protest.

At Chester Tricot, the imported nylon material is transferred to warp beams which are then used directly on the knitting machines. The transfer to the warp beams does not produce twist.

At Pennwood, the nylon material is placed in the hosiery machine while still on the pirns, that is, without any transfer to spools other than those used for shipment by the manufacturer.

Mr. Buckley testified that he regarded any material usable on knitting or weaving machinery for the production of textile fabrics as

yarn regardless of its composition. He then stated that nylon filament is also filament yarn and that filament yarn is nylon yarn. The witness does not distinguish between yarn and filament as long as the material can be used on a knitting or weaving machine. Mr. Buckley stated that a nylon filament is a single strand that is part of a multifilament yarn.

The witness testified that he could not employ the undrawn nylon in the Chester Tricot plant since the material would "stretch endlessly" prohibiting its use in a knitting or weaving operation.

Without question, the instant merchandise consists of a single filament or monofilament having a slight twist and used in the same manner as yarn.

Based upon the foregoing, plaintiff contends the record amply supports the fact that the imported merchandise is prepared for actual use for knitting without further conversion. Accordingly, plaintiff urges the court to find said nylon to be a yarn for tariff purposes.

On the other hand, defendant contends, relying on *United States* v. *Guy B. Barham Co., for University Shoppe*, 26 CCPA 83, T.D. 49614, that paragraph 1301 involved herein and the balance of the paragraphs contained in schedule 13, to and including paragraph 1305, cover synthetic textiles in various forms. It is, therefore, contended by the defendant that, regardless of the name, it is the form which is intended to govern classification under said paragraphs and, therefore, in order to have a yarn, there must be several filaments twisted together.

The oft-cited construction of the phrase, "yarns, threads, or filaments" as encompassing "only such materials as are generally known as materials for knitting, weaving, or sewing," as contained in *United States* v. *Veit, Son & Co.*, 8 Ct. Cust. Appls. 290, T.D. 37540, is not decisive herein. The construction therein was of paragraph 150 of the Tariff Act of 1913, the predecessor of paragraph 1529 of the Tariff Act of 1930, and was intended only to distinguish such textile substances as yarns, threads, or filaments from articles such as lame, bullions, etc., which are ordinarily not considered to be materials for knitting, weaving, or sewing. The decision therein was not intended to hold that all filaments are of the type or kind which fall within these categories. The finding was simply made within the scope of the Tariff Act of 1913 therein being construed.

The definition of yarn was considered in our decision in *Geo. H. McFadden & Bros., Inc.* v. *United States*, 50 Cust. Ct. 133, C.D. 2401. During the course of the decision, we cited the following authorities:

Webster's New International Dictionary, unabridged (1929), gives the following definition of "yarn":

> yarn, * * * 1. Spun wool; woolen thread; also, thread of other material, as of cotton, flax, hemp, or silk; material spun and

prepared for use in weaving, knitting, manufacturing sewing thread, or the like.

\* \* \* \* \* \* \*

Senate Report No. 37, 71st Congress, 1st session, was made to accompany H.R. 2667, which subsequently became the Tariff Act of 1930. Under schedule 13, paragraph 1301, the following information is contained:

As written, the House bill provides in paragraph 1301 for rayon yarns, which term in trade usage means ordinarily filaments which in the process of manufacture are twisted together and are adaptable for use in textile operations without further conversion. \* \* \*

We therein concluded as follows:

In view of the foregoing definitions and information, in order for an article to be a yarn, it must be prepared for or suitable for use in weaving, knitting, or otherwise suitable to form a textile fabric.

Since the merchandise involved in the *McFadden* case, *supra*, was multifilament yarn, the question of whether several filaments must be twisted or laid together was not considered. We are now, however, confronted with this precise issue. It has been established that the imported monofilament unquestionably is used for knitting in its condition as imported without further conversion.

Is the question of use as prescribed by the dictionary definition and legislative history, as quoted in the *McFadden* case, *supra*, of greater consideration than the phrase, "ordinarily filaments which in the process of manufacture are twisted together," as stated in Senate Report No. 37, *supra*?

It is obvious by the use of the term "ordinarily" that Congress did not consider twisting together to be a prerequisite. On the other hand, the utilization of the language relative to use without further conversion does appear to be a main factor in determining what the intent of Congress was in enacting paragraph 1301 of the Tariff Act of 1930. Whether the term, "yarn," is a use provision or not, the question of use is an important factor in determining classification. *United States* v. *Quon Quon Company*, 46 CCPA 70, C.A.D. 699. As indicated, *supra*, both the Webster dictionary definition and the legislative history quoted in the *McFadden* case, *supra*, require "use" as a prerequisite for the determination of whether or not an article is a yarn. The requirement of use was not only so in 1929 but continues so today, as is apparent from the following source quoted in the *McFadden* case, *supra*.

Matthews' Textile Fibers, sixth edition, makes the following statement with respect to "yarn":

A yarn is a generic term, according to A.S.T.M., for "an assemblage of fibers or filaments, either natural or manufactured,

twisted or laid together to form a continuous strand suitable for use in weaving, knitting, or otherwise intertwining to form textile fabrics."

A further review of the well-recognized A.S.T.M. standards, referred to above, part 24, D 123, gives the following information:

Monofilament, n.—1. A single filament.
2. A single filament which can function as a yarn in commercial textile operation, that is, it must be strong and flexible enough to be knitted, woven, or braided, etc. (see yarn).

Yarn, n.—A generic term for a continuous strand of textile fibers, filaments or material in a form suitable for knitting, weaving, or otherwise intertwisting to form a textile fabric. Yarn occurs in the following forms:
(a) A number of fibers twisted together,
(b) A number of filaments laid together without twist (a zero twist yarn),
(c) A number of filaments laid together with more or less twist,
(d) A single filament with or without twist (monofilament), or
(e) A narrow strip of material, such as paper, cellophane, or metal foil, with or without twist, intended for use in textile construction.

It is apparent from the foregoing that the term "yarn," as applied to the form of a substance, is nonselective for tariff purposes. In that context, it can and does embrace monofilaments, parallel filaments, twisted filaments, and plied filaments, and, therefore, when so construed, does not permit an intelligible separation of the various forms of strands provided for in schedule 13. The term becomes distinctive and determinative of separate tariff enumerations when it is defined, not by reference to form but rather by reference to use. Then it is possible to differentiate between filaments and yarns as provided for in paragraph 1301, supra.

It is also interesting to note the following language quoted in said McFadden case, supra, from Senate Report No. 37, supra:

* * * Thus interpreted, the word "yarn" does not include artificial horsehair—a monofilament—nor the long-length filaments which, after extrusion from the spinning nozzle, are wound by parallel grouping without twisting. Since such filaments may be twisted into a yarn by silk throwsters and manufacturing consumers, they would be competitive after conversion from the imported state. There is, therefore, added to paragraph 1301 a new provision for rayon filaments, single or grouped, to cover both the artificial horsehair and the long untwisted filaments.

From the foregoing language of Senate Report No. 37, it is apparent that Congress, in enacting the "filament, single," provision, intended

to include certain monofilaments, to wit, artificial horsehair, and certain long length filaments which are wound by parallel grouping without twist and which may by twisting be converted into yarn. The involved merchandise does not fit within either of these categories. Of greater significance is the fact that Congress was aware of the existence of these products which might, by conversion after importation, compete with domestically produced yarn. However, the imported merchandise in its condition as imported and without further conversion is obviously competitive with the domestically produced yarn because it is in fact, in our opinion and for all purposes including tariff purposes, yarn.

Accordingly, the claim in the protest that said merchandise is a yarn as described in paragraph 1301, as modified, *supra*, and as such dutiable at 22½ per centum ad valorem, is sustained.

To the extent indicated, the specified claim in the above suit is sustained; in all other respects and as to all other merchandise, all the claims are overruled.

Judgment will be rendered accordingly.